**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS  DIVISION**

| | | |
|---|---|---|
| **UNITED STATES SECURITIES AND** | ) | |
| **EXCHANGE COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **1:03-CV-1513-SEB-VSS** |
| **vs.** | ) | |
| | ) | |
| **JOHN L. MONTANA, JR., MELVIN R.** | ) | |
| **LYTTLE, PAUL E. KNIGHT,** | ) | |
| **WORLDWIDE T&P, INC., FIRST** | ) | |
| **NATIONAL EQUITY, LLC, and P.K.** | ) | |
| **TRUST & HOLDING, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ENTRY ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

This is a lawsuit brought by the United States Securities and Exchange
Commission (SEC), seeking permanent injunctive relief, civil penalties and
disgorgement, with prejudgment interest against the Defendants, who were all
alleged in some manner to be involved in an investment scam.  After obtaining
defaults against some of the corporate defendants, the SEC has set forth a
detailed account of the pertinent transactions supported by depositions,
affidavits and other materials to substantiate its claim of entitlement to
summary judgment.  Defendant John L Montana has neglected to respond to
the motion.  Defendants Melvin R. Lyttle and First National Equity, LLC filed a
response and surreply.  Defendant Paul E. Knight, who is appearing pro se,
essentially copied his co-defendants' response and surreply and submitted it

with minimal additions pertinent to his particular situation.  After reviewing the briefs and supporting materials, we are left with little doubt that the SEC is entitled to summary judgment.

## I.    *SUMMARY JUDGMENT STANDARD*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment should be granted only where the pleadings, depositions, answers to interrogatories, affidavits, and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  However, only bona fide disputes over facts essential to a determination can prevent a grant of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.   *FACTUAL BACKGROUND*[1]

––––––––––––––––––––

[1] The local rules require that a party responding to a summary judgment motion must include a section in their brief "labeled 'Statement of Material Facts in Dispute' which responds to the movant's asserted material facts by identifying the potentially determinative facts and factual disputes which the nonmoving party contends demonstrate that there is a dispute of fact precluding summary judgment."  S.D. IND. Local Rule 56.1(b).  Defendants have not done that here.  They did include their own "Statement of Undisputed Material Facts" with the apparent intention of setting out the facts (most of which are irrelevant or unsupported by admissible evidence) in a light most favorable to them.  This is not what is intended by the local rule.  The rule focuses the attention of both the parties and the court on which facts are truly in dispute;

Between August 1999 and April 2000, Montana, Lyttle and Knight, through the companies they owned (Lyttle's First National Equity ("FNE"), Knight's P.K. Trust and Holding, Inc. ("P.K. Trust") and Montana's Worldwide T&P, Inc. ("Worldwide T&P"))[2], sold interests in what was described as a high yield investment program ("Trading Program"). The program purported to finance the "private placement" trading of various instruments, including bonds, notes, securities and debentures. Montana, Lyttle and Knight promised investors that, for a minimum investment of one million dollars and without risk, they could earn extraordinary rates of return, through the Trading Program. They also represented to investors that the "Fed" or Federal Reserve Bank monitored and controlled the transactions in the Trading Program and that the banks and securities dealers involved had insurance which would more than cover each investor's principal investment.

Apparently, Defendants were good salesmen and P.T. Barnum[3] was right

_____

hence, the rule dictates that "the Court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy" if they are not specifically controverted in the opposing party's "Statement of Material Facts in Dispute." Accordingly, where it was unclear from a review of the Defendants' briefs whether a specific factual statement set forth and supported by Plaintiff was being contested, that factual statement has been assumed to be accurate.

[2]P.K. Trust and Worldwide T&P have both been defaulted in this action.

[3]The phrase, "there's a sucker born every minute" is most often credited to circus entrepreneur, P.T. Barnum. However, his biographer could never verify that he made that remark and many of Barnum's friends and contemporaries said it would have been unlike him to make such a proclamation. Historians have since credited others, mostly competitors or others seeking to discredit Barnum, as the source for the oft-reported, and now oft-quoted, statement.

when he quipped "There's a sucker born every minute!",  because the Defendants in a very short amount of time raised over $32 million from 31 investors.  As it turned out, Defendants' representations about the Trading Program were not true, and the promised financial gains did not accrue either. In fact, as bank and other records show, Lyttle and Knight misappropriated millions of dollars they had received from the investors and transferred much of the investors' funds to a British Virgin Islands Corporation named UTA-BVI, Ltd. ("UTA-BVI"), which was previously a defendant in this litigation and controlled by another former defendant, Violet Gail Eldridge ("Eldridge").[4] There, the money was further depleted through a second tier of misappropriation and investment in high risk margin trading through various investment accounts.  In the end, approximately half of the funds invested were eventually returned to about half of the investors.

The investment scheme was carried out in two phases.  During the final five months of 1999, Montana and Lyttle raised approximately $24 million from 23 investors.  During this phase, Lyttle was referred to as the "Funds Manager"

---

*See* http://en.wikipedia.org/wiki/There's_a_sucker_born_every_minute; http://www.historybuff.com/library/refbarnum.html

[4]UTA-BVI and Eldridge were dismissed in February of 2005 because the claims against them were improperly venued here.  However, SEC claims that Eldridge and UTA-BVI were part of a "fraud within a fraud" scheme whereby the management of funds designated to them in trust by FNE and P.K. Trust was actually managed for the benefit of Eldridge and certain entities with which she was affiliated, including at least $700,000 which was transferred to a bank account controlled by one of those entities without the knowledge of the FNE or P.K. Trust .

who facilitated "transactions" in the Trading Program through his company, FNE. Montana was the middle man who recruited investors and had them sign joint venture agreements requiring them to split the profits from the Trading Program with him. In October of 1999, in the second phase of the scheme, Knight began soliciting investors and continued to do so through March of 2000. He managed to raise another $8 million. The involvement of each of these individual defendants is detailed below.

*John (Jack) Montana and Worldwide T&P*

Montana is a resident of Staten Island, New York, and the sole-owner and president of Worldwide T&P, a New York corporation formed in 1997. Neither Montana nor his corporation has ever been registered as a broker or dealer with the SEC. Montana has described Worldwide T&P's business as providing intermediary assistance in obtaining financing for imports and exports.

Montana informed potential investors that he could direct them into the Trading Program run by Lyttle, representing that this was a "high yield investment program." Montana described the Trading Program to investors in general terms, telling them that various trading instruments, including medium term notes, would be purchased and sold and that a buyer for the notes would be in place before the instrument was ever purchased. The

instruments purportedly would be purchased at a slight discount, and the difference between the purchase and sale prices would generate profit for the investors.  Montana told investors that through repeated transactions on a daily or weekly basis, each transaction would generate additional profit.  The minimum investment in order to participate in the program was $1 million and each investment was to be pooled with investments from others until an aggregate of $100 million dollars was achieved, which was, according to Montanta and Lyttle, the amount necessary to qualify to participate in these types of bulk transactions that constituted the Trading Program.

Over a four-month period, from August 1999 through December 1999, Montana, acting under the aegis of Worldwide T&P, raised approximately $23 million contributed by 22 investors.  He solicited these investors, had them sign joint venture agreements and transmitted the documents to the investors that Lyttle provided.  The Lyttle investors either returned the signed paperwork to Montana or sent it on directly to Lyttle.  Montana deposited from one investor $1 million dollars into his bank account.[5]  On numerous occasions, Montana represented to investors that their investments in the Trading

---

[5]The affidavit of Securities Compliance Examiner, Matthew Harris, details his investigative tracing of investor dollars which were placed in accounts owned or controlled by Lyttle and Knight.  It also accounts for the placement of $1 million into an account controlled by Montana, but does not account for where the money went from there.  The impression is thus created that the money was used by Montana or his corporation and nothing was returned to the investor, but there is no affidavit testimony or exhibit which provides adequate evidentiary support for reaching that conclusion.

Program were perfectly safe and would generate extraordinary rates of return. Montana explained to investors that their principal was never at risk because, in participating in the program, their funds never left a secure account under the investor's name at the bank or securities brokerage house designated by Lyttle. According to Montana, additional security or safety was ensured because a government agency, namely, the Federal Reserve, monitored and controlled all the transactions.

Montana informed investors that nothing was required of them other than their money and their silence; that is, the information about the Trading Program was to be kept secret. Investors testified that Montana told them that secrecy was the lifeblood of these programs and any public divulgement of information would cause the investor to be kicked out of the program and, in all likelihood, suspended from the Trading Program as well. In an August 25, 1999 letter sent to investors with the heading, "Urgent Notice!! Urgent Notice!!", Montana repeated the admonishment for secrecy, warning that any unauthorized communications in "these types of transactions" would constitute "a violation of the laws of the Federal Reserve and the guidelines of the participating banks and securities firms, regarding the same." The letter further threatened that the punishment for unauthorized communications, taken to its "highest level of possible recourse," would be a "fine and/or imprisonment" and "violators will be 'Blackballed' by the Federal Reserve and

the banking community at large, permanently, without recourse, and which will automatically exclude the individual(s) and/or entity (ies) from participation in these types of transaction [sic], ever." P.T. Barnum's famous phrase again comes to mind.

*Melvin Lyttle and FNE*

Lyttle, who has been on social security disability since 1987, is 55 years old and lives in Lawrenceburg, Indiana. He is the owner, CEO and sole employee of FNE. Initially, Lyttle's representations to investors were not made directly, but through Montana. Lyttle had informed Montana that he was a trader in a program that could generate returns for investors. According to Lyttle, this trading program consisted of buying and selling bank debentures or medium term notes at a discount and reselling them to institutional investors at a profit. Lyttle explained to Montana that transactions in the Trading Program were entirely safe and that investor funds would be segregated and converted into United States Treasury Bills. Lyttle also told Montana to expect, at a bare minimum, profit in the range of 10% to 11% on each trade in the Trading Program, with as many as five trades taking place in a week. Moreover, Lyttle assured Montana that, because investor funds would be held in a "major security house," there would be insurance coverage in excess of 100% of the aggregate fund value. Montana repeated Lyttle's representations to investors, sometimes embellishing on them. No due diligence was

performed by Montana with respect to Lyttle and his background in the investment field.

After investors completed preliminary paperwork supplied to them by Lyttle through Montana, including a five-page "Letter of Application, Proof of Asset, Authority to Verify and Exclusivity"; a three-page "Non-circumvention, Non-Disclosure Agreement;" and a one-page "Non-Solicitation Letter," each investor received and was required to execute an Exclusive Asset Management Agreement ("EAMA").[6] The EAMA referenced Lyttle as CEO of FNE and the "Funds Manager." It set forth the nature of the Trading Program, the rates of return that could be expected and described in various ways the safety of each investor's funds. The EAMA also included many sections which contained provisions clearly designed to appear substantive and official, which actually carried no legitimate significance with regard to the types of trades supposedly to be conducted. In fact, as confirmed by the SEC's financial trading expert, many of the representations in these agreements have no significance in the financial world and amount to little more than gibberish. For example, the EAMA states that the client or investor attests that the funds provided are "good, clean, clear, legally earned and held" and that the term of the agreement is the amount of time it takes for the Fund Manager "to complete 156 trades

---

[6]Lyttle prepared the EAMA and sent it to Montana, who forwarded it to investors. Some investors returned the signed EAMA to Montana, while others mailed back the signed version directly to Lyttle.

but not to exceed 380 calendar days per account, from date initial funding of said account is available within the part of this agreement by signed addendum to the same."

According to the EAMA, Lyttle, as "Funds Manager," used the investor funds to purchase and trade "bonds, notes, securities, debentures, or other instruments of value." The EAMA implies that the Trading Program would generate net returns in excess of 11% per trade with more than one hundred trades occurring within a year. It promised that investor funds would be kept safe in a segregated account to prevent "co-mingling of funds" and that no one other than the investor would be authorized to remove the funds from the account. After executing an EAMA, investors were led to believe that trading would begin shortly. In truth, there were long periods of delay with no trades occurring for which investors were given excuse after excuse.

In response to burgeoning complaints from the initial investors, Lyttle sent a November 5, 1999 letter to Montana for distribution to investors, entitled "Investor Update," in which investors were informed that their funds were –

> inside the largest volume Securities House in the world and the largest bank in the world under a full TRUST agreement. United States Government T-Bills were purchased by the Securities House which are in blocks of 10.0 Million USD with delivered CUSIP numbers handled in Private Banking. This is to cause what we are doing to fall under the security of the U.S. Government, TRUST laws, and the insurance company of the Securities House and is

not readily available cash for anyone to just spend.  It creates
insurance for the client of 196% of their original deposit in case of
loss or misuse through the Securities House or any individual.

The letter authorized by Lyttle further explained that, because the $100 million

minimum for the Trading Program to begin had not yet been reached, the

funds had been placed into a "short term" program or "SCAN situation."  As

Lyttle put it:

> [A]t no time were the funds put at risk or moved or pledged, but
> only agreed to have the account scanned as part of another
> program. The attorney for that group signed a contract and we
> were told that it had begun, and relayed that information to you
> and the investors. This was not the original scenario, but just
> something to do while we were waiting, without exposure to
> deposits in any manner whatsoever.

Lyttle's representations were plainly false.

*Paul Knight and P.K. Trust & Holding, Inc.*

At the same time Lyttle was attempting to appease initial investors by his

letter, Knight was enlisting more investors to participate in the Trading

Program.  A 57-year-old resident of Kodak, Tennessee, Knight is the sole

owner, employee and officer of P.K. Trust, a Tennessee corporation formed to

facilitate transactions in high yield investment programs.  Neither Knight nor

P.K. Trust was ever registered with the SEC as a broker or dealer.

Knight required of his investors that they execute agreements he titled

"Private Placement Agreement."  Knight also required that all of Montana's

investors also sign the Private Placement Agreement.[7]  Knight met with many of his investors to describe the Trading Program, or Assets Enhancement Program, as Knight referred to it.  Knight explained to one investor that the Trading Program was an international program set up to provide funds to European communities devastated by World War II.  He gave his personal assurances to these investors that their funds were completely safe, having been applied to the purchase of United States Treasury Bills.  He also advised one of the investors that the rates of return in the Trading Program would approach 100% per week.

Like Montana, Knight also made representations to investors that the Federal Reserve was monitoring and controlling the Trading Program and that he personally had security clearances at the highest levels of the government, having formerly been a CIA agent, and thus was "volunteered" by the government to work on these types of transactions.  Acting as the "Assets Manager" under the Private Placement Agreement, he certified that he had "special knowledge in the procedures and transactional mechanisms of the type of Transaction set out in The Agreement", though he has subsequently admitted to having no such expertise.  A sampling of the most outlandish and nearly unintelligible of Knight's representations in his Private Placement

_____

[7]Apparently, some contrived explanation was given Montana's initial investors prompting them to execute agreements with Knight thereby allowing Knight to advance the promised Trading Program.

Agreement includes [with all errors repeated here, as found in the original text]:

>The security of the investor funds: The Largest volume Securities House, within the top (3) World Bank, A full Trust Agreement, United States Government T-Bills, which creates insurance for the client of (196%) of their original deposit.
>
>The Assets Manager has set up and operates with top 24 Western European Bank. The Assets Enhancement Program for Project Development, utilize banks that can ensure full bank integrity of The Transaction whose undertakes are in complete harmony with international banking rules and protocol and who guarantee maximum security of a Funder's Capital Placement Amount.
>
>After the Trust bank deducts reasonable banking fees, the gross returns from The Assets Enhancement Program for Project development shall be distributed as follows:
>>A) One Million U.SD initital funding can be compound for trading.  Payment will be each Monday that the Funder doesn't compound profits.
>>B) A Fifty/Fifty split between the Funder (per Trade Day) and The Asset Manager of the full face value, of The Capital Placement Amount
>>C) The total full face value will be given to the Funder at the end of The Contract Period, about fifty trading weeks.

Following the execution of his Private Placement Agreement by an investor, Knight sent to each a memorandum, printed on the letterhead of P.K. Trust, regarding the "Asset Enhancement Program Investment."  In this letter, Knight confirmed (1) that the funds the investor was investing had been received and (2) that the funds were –

>". . . reserved for The Asset Enhancement Program governed by our Agreement dated March 16, 2000.  We are waiting only on the Federal Government authorization to begin The Program; however, the funds are secured and placed in U.S. Treasury Bills for your protection of which will be credited to the respective account."

-13-

As was the case with those who signed Lyttle's EAMA, promises were made to Knight's Private Placement Agreement investors that, upon the completion of their transactions, trading would begin imminently, though once again, these investors received a series of excuses rather than results.  Knight maintained frequent contact with investors during this time via email, transmitting to them the following statements:

> • I will only tell you what I'm being told by the Fed. The trader has the paper work to start the trade. We are under a gag order on the transaction, it could and should at anytime. . . .

> • It is in trading, The first payout will be in one month. The payout will be about 5M.

> • We are in a program, it payout (sic) every month, minus 20% for fees. This program will program for 40 weeks. The first payout will be about the 10th of Aug.

> • Kurt, you are informed as I can let you know. I'm told by Blondie this morning that the trade will start Mon. Or Tues. This will be a start.  As I told you when you was here, "you never know for complete sure what the FED will do."

> • Waiting for the FED to release your funds (should be Tues.) And give me the new account#.

As the delays in payouts from the Trading Program dragged on, investors began to request that Knight return their original investment funds to them, and some of them were successful in having their monies returned.   However, approximately half of the investors had none of their commingled funds returned.  Instead, they were supplied a series of fictitious reasons for why their funds could not be returned to them, including that "(t)he Feds have

-14-

frozen the account" or that "other investors put in bad money."  Some were promised that their funds would be recouped from a separate trading program run by either Lyttle or Knight.

From the outset of their scheme, Defendants never used the investors' funds as promised.  Lyttle misappropriated a total $7.8 million of commingled investor funds to purchase for himself property associated with two factories, two homes and an adjoining  piece of residential property, vacant land in Kansas, three cars and an RV, a gazebo, and a custom piano or organ.  Knight, misappropriated approximately $1.75 million in commingled investor funds, which he used to purchase for himself two automobiles, furniture and to pay medical, computer and phone bills.  In addition, Knight made withdrawals of cash in the amount of $180,000.  Montana received approximately $1 million dollars in investor funds which he placed into his company's bank account at Bank of America on July 24, 2000; beyond those deposits, it has not been explained to us precisely how those monies were used by Montana.

To the extent the funds from the investors were not directly misappropriated, they were commingled into the accounts Eldridge controlled at the brokerage firm of Donaldson Lufkin & Jenrette ("DLJ") pursuant to "Trust Management Agreements," which Lyttle and Knight had entered into with Eldridge and UTA-BVI.  These agreements contained no protections for investor funds or for the promised returns made by Lyttle, Montana and Knight

nor did the brokerage firm agreements restrict the use of funds to the types of trades described in the agreements with investors.  At DLJ, at least $3 million of investor funds were misappropriated by UTA-BVI and Eldridge, at least $2 million of which was lost in leveraged stock trading; at least $5.05 million was sent to Lyttle; at least $224,000 was sent to Knight and at least $14 million was returned to some, but not all of the 31 investors.

Initially, investor funds were sent either to bank accounts controlled by Lyttle, through FNE, at Chase Texas Bank and Texas Capital Bank, or directly to the UTA-BVI accounts at DLJ.  Regardless of where the funds were deposited, in each instance they were commingled and not segregated.  Lyttle later transferred most of the funds at Chase Texas -- an amount totaling approximately $8.6 million -- to the UTA-BVI brokerage accounts at DLJ.  Of the funds in the FNE account at Texas Capital Bank, however, Lyttle directed only $8.5 million of the $16 million to DLJ.  Lyttle misappropriated $2.6 million of the remaining funds by using them for his own personal purposes, as earlier described.

Lyttle also transferred funds from the Texas Capital accounts and the People's Federal Saving accounts to the trust account of his attorney.  Money transferred into his attorney's account was thereafter used to pay off a mortgage on Lyttle's new home in Lawrenceburg, Indiana and to purchase a shoe factory in Osgood, Indiana.  Lyttle has admitted using investor funds to

purchase these and other properties.  He further admits to having made other personal expenditures using investor funds, including to purchase an automobile and to repay personal loans.  Incredibly, he still maintains that all his expenditures of investor funds were either legitimate investments or expenses under the EAMA.

In all, Lyttle transferred $16 million from Chase Texas and Texas Capital to the UTA-BVI accounts at DLJ.  Moreover, an additional $8 million was sent per instructions from Defendants to the UTA-BVI accounts directly by investors.  UTA-BVI, acting through Eldridge, vested sole trading authority over the DLJ accounts in an account executive who used the funds to engage in highly leveraged stock trading in margin accounts.  From September 1999 to July 2000, trading in these accounts resulted in losses of approximately $2 million.  Also, while the investor funds were at DLJ, Eldridge transferred large amounts back to Lyttle.  For example, on December 1, 1999, Lyttle requested that Eldridge send $1.75 million to a Fifth Third bank account in the name of Industrial Hardwoods Corporation, a company in which Lyttle had a substantial investment interest.  A similar transfer of $1.3 million was made on March 28, 2000.  Lyttle used these monies to pay his company's bills.

In January of  2000, Lyttle directed Eldridge to transfer $2 million into the trust account of his attorney.   From the trust account, Lyttle directed that funds be withdrawn to permit the purchase of the Industrial Hardwoods factory

in Greendale, Indiana, in the amount of $984,615.  He also ordered the release

of funds for, among other things, a $32,000 cashier's check to purchase an

automobile, a $20,000 cashier's check payable to his daughter, Rena Jill Lyttle,

and $10,000 in cash for himself.  Lyttle's daughter used the funds to write

checks to Industrial Hardwoods and to pay over to Knight nearly $12,000.

Lyttle also directed transfers from his attorney's trust account to Knight in the

amount of $19,985.  In all, from August 1999 to December 2000, Lyttle

misappropriated more than $7.8 million of investor funds.

Knight also received funds from Eldridge.  For example, at some point in

July 2000, Eldridge transferred a portion of the investor funds into the

attorney trust account for an individual named Michael Bach at Chase New

York Bank.  From that account, Knight received $224,990 in two payments,

one made on July 21, 2000 and the other on October 13, 2000.  Knight used

this money to purchase, among other things, two automobiles for a total of

$62,423 and to permit $180,000 in cash withdrawals.  Also, at Knight's

direction, $2.5 million in investor funds were transferred from the Bach trust

account to the escrow account of an attorney named Michael Fine,  in

Cleveland, Ohio.  Knight falsely represented to Fine that these were  corporate

funds under his signatory control.  From the Fine account, an amount in

excess of $1 million was returned to an investor, while another $100,000 was

sent to Knight's bank account.  That left $1.35 million, which was sent to

-18-

various overseas  accounts and otherwise remains unaccounted for.  In all, from August 1999 to December 2000, Knight misappropriated nearly $1.75 million of investor funds.

## III.   *Discussion*

*Count I*

In the first count of its complaint, the SEC alleges that Montana, Knight and Lyttle, as well as their corporate creations, violated sections 5(a) and 5(c) of the Securities Act.  Those provisions of the Act prohibit the sale or offer for sale of securities unless a registration statement for the security has been filed. 15 U.S.C. §§ 77e(a), 77e(c).  In order to prevail on such a claim, the SEC must show that: (1) each defendant directly or indirectly sold or offered for sale a security; (2) no registration statement has been filed as to the security; and (3) the offer or sale was made through the use of interstate facilities or the mails. *S.E.C. v. Spence & Green Chemical Co.,* 612 F.2d 896, 901-02 (5th Cir. 1980); *S.E.C. v. Autocorp Equities, Inc.*, 292 F.Supp.2d 1310, 1327 (D.Utah 2003). Defendants argue that what they sold was not a security.

Both the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") define a "security" to include an investment contract. 15 U.S.C. § 77b(a)(1), 15 U.S.C. § 78c(a)(10).  An investment contract "means a contract, transaction or scheme whereby a

person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ."  *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).  In *Howey*, the Supreme Court articulated the test for determining if an investment contract exists, namely, whether a particular contract, transaction or scheme involves the investment of money in a common enterprise which the investor is led to believe will generate profits solely from the efforts of others.  *Id.*  Defendants agree there was no common enterprise here because the EAMA called for each investor's funds to be segregated and managed individually.

While the contract did provide in one of its provisions for segregation of funds, other provisions conflicted with the segregation terms by specifying that the funds were to be accumulated with other investors' funds until a minimum of $100 million was reached, at which point trading in minimum $100 million increments would be triggered.  While all the contracts involved here contained these and other contradictory provisions, the $100 million threshold necessary to trigger the program trading was part of the deal, both by virtue of verbal representations and under the terms of the EAMA.  In fact, delays in making payouts were often explained to investors as being the result of needing to wait for the minimum amount to be reached or because someone had put "bad" funds into the Trading Program.  A common enterprise was clearly what was intended here by Defendants in offering and selling these investment contracts.

-20-

Since it is undisputed that the Trading Program was not registered as a security, and having found that the Trading Program was a common enterprise, we conclude that the sale and offer for sale of interests in the Trading Program by the Defendants was a breach of the securities registration provisions of the Securities Act and accordingly, the SEC is entitled to summary judgment on Count I of its complaint.

*Counts II, III & IV*

The next three counts of the SEC's complaint allege violations of various anti-fraud provisions in various federal securities laws. More specifically, the SEC charges that the Defendants violated Sections 17(a)(1), (a)(2), and (a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1)-(3), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10-b thereunder, 17 C.F.R. § 240.10b-5. These statutes require that the SEC establish that Defendants made misrepresentations or omissions of material fact in connection with the offer or sale of a security. Section 17(a)(1) of the Securities Act and section 10(b) of the Exchange Act require the SEC to prove scienter, whereas sections 17(a)(2) or (3) require only a showing of negligence on the part of a defendant. *S.E.C. v. Holschuh*, 694 F.2d 130, 143 (7th Cir. 1982). A fact is considered "material" if there is a substantial likelihood that a reasonable investor would consider the fact important, and the fact, if disclosed, would have significantly altered the total mix of information made available to the reasonable investor. *Basic, Inc.*

*v. Levinson*, 485 U.S. 224, 231-32 (1988).

As the facts described above amply demonstrate, Montana, Lyttle and Knight, acting through their respective companies, misrepresented the use, safety and control of the investor funds.  Each represented to the investors that their funds would be placed in a program that would generate extraordinary rates of return with no risk to the principal.  The evidence makes clear that neither promise was ever intended nor did it ever materialize.  In fact, no Trading Program even existed.  The SEC has proffered unchallenged expert testimony establishing that those programs did not exist beyond the world of con artists and defrauders arguably such as these defendants.  Further, the deposition testimony of the investors makes it clear that Defendants' representations and assurances made in connection with the offers for sale of securities, in particular with regard to the use, safety, rates of return and control of the funds they were investing, were important in terms of the investors' decisions to invest.  Thus, we turn now to decide whether the uncontroverted evidence supports a finding as to the necessary state of mind of each Defendant because, if so, the SEC is entitled to summary judgment on these claims.

Persons who act with an intent to deceive or with reckless regard for the truth are deemed to possess the necessary scienter to support a violation of section 17(a)(1) of the Securities Act and section 10(b) of the Exchange Act.

*S.E.C. v. Jakubowski*, 150 F.3d 675, 681 (7ᵗʰ Cir. 1998).  A company may have

imputed to it the scienter of the individuals who control it.  *S.E.C. v. Manor*

*Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n.3 1097 n. 18 (2d Cir. 1972).

    At the very least, it is clear that Montana, through Worldwide T&P, acted

recklessly in relying on Lyttle's representations concerning the Trading

Program without performing any due diligence to confirm what Lyttle had told

him and the investors.  *See S.E.C. v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 10

(D. D.C. 1998) (noting that a failure to conduct due diligence indicates

recklessness).  Montana failed to verify the details of the Trading Program,

never mind its existence, including whether the promised rates of return could

actually be achieved or whether the investor funds were, in fact, safe.  Further,

Montana continued to rely on Lyttle's descriptions of the Trading Program and

to solicit additional investors' funds, even though he has stated that he did not

think Lyttle had  provided him with sufficient information.  In terms of

resolving the issues presented in the pending motion, Montana has not

troubled himself to provide any response to the SEC's motion.  Thus, the

record is devoid of any evidence or argument indicating anything other than

Montana's apparent, complete  willingness to serve as a shill for Lyttle as well

as Lyttle's fictitious Trading Program.

    Lyttle and Knight have filed responses to the motion, but attempt to rely

on their same "hide the ball" tactics and lingo-laden gibberish in framing their responses, in an obvious effort to divert the court's attention from the uncontroverted evidence, much as they did with their unsophisticated clients. We will not be so easily misled.  It is clear to the court that Lyttle, through First National Equity, acted with scienter insofar as he had to have known that his statements about the Trading Program were false.  Even if, as Lyttle implausibly asserts, he was nothing more than a conduit to Estridge who ultimately pulled the wool over his eyes, Lyttle continued to sign people up through his EAMAs long after he well knew that the investor funds were being used in a manner contrary to his representations to these investors and even after using some of the investors' funds for his own personal purposes.

Knight clearly knew that no legitimate trading program actually existed that would or could deliver on the promised financial returns without invading the investors' principal.  And Knight also used the funds in a manner totally inconsistent with the representations he had made, both through his written agreements and verbal representations with individual investors before and after the investments were made.

In their submissions to the Court, Lyttle and Knight (the latter through his "me too" copying of Lyttle's brief) invoke statements totally unsupported by the record and distort the terms of the written agreements often to a point of absurdity.  Neither defendant provided substantive testimony in their

-24-

depositions, invoking their Fifth Amendment right against self-incrimination as they were entitled to do, though their silence opens them up to adverse inferences in this civil matter.  That strategy foreclosed any substantive assertions in their briefing in response to the SEC's summary judgment motion for lack of evidentiary support in the record.  Because there are no genuine issues of material fact concerning Defendants' misrepresentations or omissions of material fact in connection with their offers or sales of a securities, which acts they committed with the required scienter, summary judgment against them on Counts II, III and IV is appropriate.

*Count V*

The SEC has also charged Montana and Knight in Count V with violating Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).  Section 15(a)(1) makes it illegal for a "broker" to effect any transaction in, or to induce or attempt to induce the purchase or sale of any security unless such broker is registered with the Commission or, in the case of a natural person, is associated with a registered broker-dealer.  15 U.S.C. § 78o(a)(1).  A broker, as defined at Section 3(a)(4) of the Exchange Act, 15 U.S.C. § 78c(a)(4), is any person "engaged in the business of effecting transactions in securities for the account of others."  There is no requirement to prove scienter to establish a violation of this statute.

Neither Montana or Knight has responded to the SEC's motion respecting this count, perhaps because neither has a basis to contest the allegations. The undisputed evidence establishes that they offered interests to investors in the Trading Program and that, in doing so, they were not registered as securities brokers or dealers. Our conclusion that the interests they offered to investors were, in fact, securities resolves this count against each of them, and summary judgment shall enter accordingly.

*Count VI*

Section 15(c)(1) of the Exchange Act, 15 U.S.C. § 78o(c)(1), prohibits brokers and dealers from using manipulative, deceptive or other fraudulent devices or contrivances in connection with securities transactions. This anti-fraud provision applies to both registered brokers and dealers and to persons, such as Montana and Knight, who illegally act as brokers or dealers without SEC registration. *S.E.C. v. Randy*, 38 F. Supp. 2d 657, 670 (N.D. Ill. 1999). Each has a duty of fair dealing which requires, at a minimum, that each must undertake some investigation to substantiate the legitimacy of the securities being recommended by them. *Id.*

In this instance, not only did Montana and Knight indisputably fail to fully investigate the investment contracts they offered to their clients, there is clear evidence that Knight knew that fraud was involved and nonetheless

participated fully in advancing that fraud by his own false statements to clients and his misappropriation of their investment funds for his own use.  Montana's placement of $1 million in investor funds directly into his own personal bank account defies any legitimate explanation, establishing without doubt his knowing participation in the fraud as well.  The representations they made to investors, the inaccuracy of which Knight and Montana now admit, had one purpose and one purpose only: to dupe people into giving them their money.  That's fraud, plain and simple.

The elements of a Section 15(c)(1) violation are essentially the same as the elements under Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  *See Darvin v. Bache Halsey Stuart Shields, Inc.*, 479 F. Supp. 460, 464 (S.D.N.Y. 1979).  As discussed above, while acting as unregistered brokers, Montana and Knight knowingly misrepresented and failed to disclose material facts regarding the nature of the investments they were selling, the use and safety of the investor funds and the rates of return on the investments.  Thus, once again, the SEC is entitled to summary judgment on Count VI alleging that Montana and Knight violated Section 15(c)(1) of the Exchange Act.

### IV.    *Available Relief*

The evidence of record readily establishes that the Defendants engaged in investment scams which served to enrich them in significant amounts through the misappropriation of investor funds.  As explained above, the SEC is entitled to summary judgment on all its claims against Montana, Lyttle, Knight and their respective corporate entities.  That decision leads to the issue of what relief is available and appropriate here.

*Permanent Injunction*

The SEC seeks a permanent injunction against the defendants, pursuant to section 20(b) of the Securities Act and section 21(d)(1) of the Exchange Act. 15 U.S.C. § 77t(b), 15 U.S.C. 78u(d)(1).  Both of these statues allow for the issuance of a permanent injunction where there has been a showing that the person to be enjoined is engaged or is about to engage in acts or practices constituting a violation of either Act.  Once a violation of these provisions has been established, as has occurred here, "the moving party need only show that there is a reasonable likelihood of future violations in order to obtain relief." *S.E.C. v. Holschuh,* 694 F.2d 130, 144 (7th Cir. 1982).

> In predicting the likelihood of future violations, a court must assess the totality of the circumstances surrounding the defendant and his violation, including such factors as the gravity of harm caused by the offense; the extent of the defendant's participation and his degree of scienter; the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary

business activities might again involve him in such transactions;
the defendant's recognition of his own culpability; and the sincerity
of his assurances against future violations.

*Id.*

The SEC contends that permanent injunctions against all the Defendants
are required here because of the egregious frauds they each perpetrated
through which they wrongfully acquired $32.8 million from a total of 31
investors.  Total investor losses amount to approximately $15.6 million, which,
as the late, legendary Everitt R. Dicksen, United States Senator from Illinois,
would have put it, is "real money."  The Defendants' repeated
misrepresentations about the use, safety and control of investor funds and the
existence and assurance of profits in the Trading Program clearly evidence their
criminal scienter.  Moreover, Defendants knew, at the time they were diverting
investor money, that those funds were actually intended by their victims to be
invested in the putative "Trading Program."  It is almost beyond belief that
Lyttle and Knight, even at this point, continue to deny any wrongdoing,
claiming that they themselves were the victims here.  They continue to be the
sole owners of their corporate creations, which they admit continue to be
involved in financing activities and fund raising.  Montana testified initially that
his role was limited to being nothing more than a conduit but, more recently,
he has simply opted out of playing any active role in this litigation against him
and his cohorts.  He retains a majority interest in the corporate defendant,

-29-

Worldwide T&P, which he claims he created to assist in conducting financial arrangements for importers and exporters of various products.

We have no difficulty concluding that the SEC is entitled to the injunctive relief it seeks against Montana, Lyttle and Knight, as well as against their corporate entities.   None of the defendants has made any effort to challenge or resist the request for equitable relief, beyond arguing that they are innocent. Each remains in a position empowering him to manage corporate entities involved in significant financial activities.  Accordingly, injunctive relief is entirely proper to curtail and hopefully prevent future fraudulent behaviors by these persons and the companies or other entities they control which continue to provide both the opportunity and a front for their fraudulent activity. Because the SEC has not submitted to the Court any proposed language for such an order of injunctive relief, we shall defer the entry of such an order until the SEC submits its proposal, after which Defendants will be allowed 10 days within which to comment on or otherwise respond or object to the submission from the SEC.

*Disgorgement, Prejudgment Interest & Civil Penalties*

We accept the SEC's assertion that the securities laws vest in the court broad discretion to fashion appropriate remedies, which could include an order of disgorgement and prejudgment interest.  *S.E.C. v. First Jersey Securities, Inc.,*

101 F.3d 1450, 1474 (2nd Cir. 1996).  We acknowledge as well the court's power to impose a civil penalty against a defendant who is determined to have violated the Securities Act or the Exchange Act. 15 U.S.C. § 77t(d), 15 U.S.C. § 78u(d)(3).  However, in our view, the record before us does not support entry of an order of disgorgement or prejudgment interest as penalties.  The evidence adduced thus far accounts for only a portion of investor funds in terms of how much was improperly and fraudulently drawn down by any particular defendant, and nearly all of that evidence came in through affidavit without opportunity for cross-examination or other clarification.  Further, we lack any evidence of the current financial circumstances of any of the Defendants.  In fashioning equitable remedies, we think it advisable to defer entry of any order of disgorgement or interest penalties until evidence and argument can be heard on these issues.

## V.   *Conclusion*

For the reasons discussed in this entry, the SEC is entitled to summary judgment on its claims against, John L Montana, Paul E. Knight, Melvin R. Lyttle  and First National Equity, LLC.  The SEC is ordered to tender to the court and serve on the parties proposed language for a permanent injunction, within 30 days of the entry of this order; Defendants may file their responses and or objections to the tendered proposal within 10 days of the SEC's submission to the court.  Upon receipt of same, the court will determine

whether and when a hearing should be scheduled to allow the court to receive evidence and argument with respect to the appropriateness and amount of any order of disgorgement with prejudgment interest as well as with respect to the assessment and amount of any other civil penalties.  Evidence from defendants relevant to extenuating circumstances, if any, will be accepted at that time as well.  *See S.E.C. v.  Church Extension of the Church of God, Inc.*, 429 F.Supp.2d 1045 (S.D. Ind. 2005).

IT IS SO ORDERED   11/22/2006

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

-32-

Copies to:

John E. Birkenheier
SECURITIES AND EXCHANGE COMMISSION
birkenheierj@sec.gov

Steven Lee Klawans
US SECURITIES & EXCHANGE COMMISSION
klawanss@sec.gov

Boris Parad
PARAD LAW OFFICES P.C.
goto@paradfirm.com

Jason Yonan
UNITED STATES SECURITIES AND EXCHANGE COMMISSION
yonanj@sec.gov

JOHN L. MONTANA JR.
49 Caswell Ave.
Staten Island, NY 10314

PAUL E. KNIGHT
917 Palmer Court
Kodak, TN 37764

MELVIN R. LYTTLE
FIRST NATIONAL EQUITY, LLC
502 Fifth Street
P.O. Box 007
Aurora, IN 47001-0007